UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>JUNIOR MELENDEZ, )<br>KEITH JOHNSON, )<br>GRACE KATANA and )<br>SHAUN WALKER )<br>)<br>Defendants. )<br>) | Criminal No. 19-40024-TSH |

**Findings and Order on Defendant Grace Katana's Motion to Suppress
Evidence Pursuant to Fed. R. Crim. P. 12(b)(3)(C) (Document #71)**

**September 28, 2021**

**Introduction**

Grace Katana is charged in a one count indictment with conspiracy to interfere with interstate commerce by robbery in violation of 18 U.S.C. §1951.  He has moved to suppress from the introduction into evidence against him at trial, intercepted telephone communications and cell phone location data obtained from three telephones[1].  He assigns as reason for the suppression that the agents monitoring the wiretap disregarded this court's order to minimize intercepted telephone communications, and the authorities lacked the exigent circumstances necessary to track their cell phones using CLSI without a warrant.  For the reasons set forth below that motion is **denied**.

---

[1] Katana has been joined in this motion by all other defendants

## Facts

In July of 2018, Worcester police, and the ATF and the DEA began investigating defendant Junior Melendez and his associates for drug and firearm offenses. Mr. Melendez was known to the police after having been convicted of similar offenses in 2006 for which he served a lengthy (109 month) sentence. He was identified by the police as the leader of the Massachusetts chapter of the Almighty Vice Lords, a violent street gang. In September of 2018, the authorities obtained a warrant to search Mr. Melendez' Facebook records. In December of 2018, the authorities installed a pole camera in front of 26 Malvern Street in Worcester, Massachusetts which was an address associated with Mr. Melendez. On March of 2019, the government obtained authorization to intercept wire and electronic communications from Mr. Melendez' cell phone. In the March 13, 2019 wiretap authorization, the court ordered that agents monitoring the wiretap interceptions take steps necessary to minimize the intrusion upon non-criminal communications. Specifically, the court ordered that:

> "all wire and electronic interceptions occurring over target telephone 1 will be minimized in accordance with the minimalization requirements of Chapter 119 of Title 18 of the U.S.C.. . .   Monitoring of conversations will terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of title 18 of the U.S.C. Interceptions will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the target subjects or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Special attention will be paid to minimize privileged communications . . . If a non-privileged conversation has been minimized, the monitoring agents will spot check to ensure that the conversation has not turned to criminal communications."

In furtherance of this Order and before the interception of any communications, the United States Attorney in charge of this case met with the monitoring agents. The AUSA provided each with a 24-page minimization memoranda in order to guide the monitors in accordance with the Order. He also read the memorandum in its entirety to the monitoring personnel. Prior to monitoring any communications, the monitoring agents certified that they had read the affidavit in support of the wiretap application and the Courts March 13, 2019 Order.

On March 14th agents begin the interception of communications involving Melendez' telephone. On March 19th agents intercepted a series of phone calls between Melendez and other Defendants that revealed what they believed was the planning of a home invasion and

armed robbery.  On March 19th at approximately 5:33 PM the defendant Johnson called Melendez (Session 2882) on a call that lasted less than two minutes.   Johnson asked to meet with Melendez to "speak about that." Melendez responded that an unknown male was "OT," and that Melendez was "waiting for him to come from out there so he could get all the details broke down."  Melendez further said that "he was 100% sure" but that the unknown male "was not coming back for another four," and "we will know everything." Melendez then informed Johnson that he (Johnson) would be accompanied by Walker AKA "Shiz."   Johnson told Melendez that he wanted to bring a larger male with him "for more body, just in fact they inside."  Melendez assured Johnson that "we will figure it out," and Johnson responded, "I'm going in first, it doesn't even matter."

On March 21, at 12:50 p.m. the Defendant Katana called Melendez (Session 3837). During that one minute, thirty-two second call Katana told Melendez that "yeah, you can do that shit Sunday if anything."  Katana asked, "is it a go?" and Melendez responded "yeah, they all lined up."

On March 23, at 9:41 a.m., Melendez called Johnson (Session 5002). During that 43 second call Melendez advised Johnson "tomorrow" and informed Johnson that another male "was out there right now getting the whole layout" and that the intended victim's home is "like a rich, rich ass neighborhood." Johnson asked, "who's in the crib" and Melendez stated that the other male was going to let him know everything.

On March 24, at 7:12 p.m. Melendez called Johnson. (Session 5424).   In that 55 second phone call Melendez informed Johnson "tonight around two or three in the morning."  Johnson confirmed that he would be ready and Melendez told Johnson that he would "scoop" Johnson soon so that they could "get detailed out."

On March 25, at 1:42 a.m. Melendez called Katana (Session 5547 ).  During that 47 second phone call Melendez asked, "what was going on?" Katana responded that he was ready whenever the guys were ready, and Katana and Melendez agreed to meet by a barbershop. At 2:04 a.m., Melendez again called Katana (Session 5552). During that two minute and four second phone call the two men discussed "scoping it out."  Melendez informed Katana that they would "do it tomorrow" because Melendez wanted to "make sure and get away with it" and that "two or three in the morning was not really the best time to do it."

Melendez made plans to meet Katana at a location in Worcester early in the afternoon of March 25th. At 12:34 p.m. Melendez called Johnson (Session 5737). During that 42 second phone call Melendez asked if Johnson was ready, instructed Johnson to call him when he was ready, and stated that he would pick Johnson up and then go to pick up Walker. Approximately 1:08 p.m. Johnson called Melendez (Session 5760) and during this 42 second phone call Johnson asked, "you got the thing, or I bringing mine?" Melendez said he is finding out right now, but "he might not, he probably not even be there." Melendez told Johnson to "bring one just in case," which Johnson acknowledged.

On March 20th the government had applied for and received a search warrant for real time cell site location information (CSLI) for Melendez and Johnson's cell phones. They also obtained CSLI for Katana's cell phone without a warrant, obstensibly based upon exigent circumstances. Based on the above phone calls, physical surveillance, and the warranted, and unwarranted CSLI, the police tracked the defendants as they drove 60 miles in two cars from Worcester to Rockland Massachusetts.

Once the four defendants arrived in Rockland, the following telephone calls were intercepted. At 2:48 p.m. Melendez called Walker (Session 5800). During that one minute and three second phone call Melendez directed Walker "go in Home Depot" while he and Katana went to "see if the whip and shit is there." Melendez told Walker to "get whatever we need," including a pry bar and that Melendez would be right back because he was "only three minutes from this house." At 3:02 p.m. Melendez again called Walker (Session 5807) and during that one minute, 10 second phone call Walker informed Melendez that he was "in the Home Depot parking lot" and that Melendez should make the purchases that they needed because "we can't be showing our face." Walker told Melendez to "grab a crowbar or whatever you think will work." Melendez said there was a car in the driveway and that "we don't think anybody is there anyway but we're not sure."

Based upon these phone calls and the imminence of the intended home invasion the ATF and the Massachusetts State Police stopped the defendants in the Rockland Home Depot parking lot. The Defendants, Walker and Johnson occupied a Honda CRV and within that motor vehicle the police located a firearm, a 24-inch crowbar, and a four wheeled handcart. Melendez and Katana were arrested in a black Dodge Charger. Inside the Dodge Charger officers found a ski-

4

mask, two cardboard boxes containing glass marijuana smoking pipes (which had been stolen from the intended victim's doorsteps shortly before the arrest when Katana was surveilling the residence.) All four defendants were subsequently charged with conspiracy to commit a Hobbs Act robbery.

## Discussion

### A. Minimization

The defendant, Katana has filed the instant motion to suppress which was joined by the three codefendants. The defendants claim that "at no time did the agents minimize any intercepted phone calls as required by this court order authorizing the interception of telephone communications." During the hearing on this motion that argument was modified to include assertions that the agent's policy of not minimizing calls under two minutes in length violated the specific language of this Court's order quoted above. ("Monitoring of conversations will terminate *immediately* when it is determined that the conversation is unrelated to communications." (emphasis supplied)).

Title III, "does not forbid the interception of all non-relevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to minimize the interception of such conversations." *U.S. v. London*, 66 F.3d 1227, 1236 (1st. Cir. 1995). In *Scott v. U.S.*, 436 U.S. 128, 136-137, (1978), the Supreme Court recognized factors which needed to be considered when deciding whether, and when, to minimize an intercepted phone call in-order to give guidance in deciding whether agents acted in good faith with their obligation to minimize. They included the length of the call, the use of coded language, the scope of the conspiracy, and at what point in the wiretap investigation the subject interceptions occurred. [*Scott, Supra* at 140-41].

> "Many of the non-pertinent calls may have been for a short period, others may have been one time only calls. Still other calls may have been ambiguous in nature or apparently involved guarded or coded language. In all these circumstances agents can hardly be expected to know that the calls are not pertinent prior to determine their termination period."

The government urges this court to look to the percentage of non-pertinent calls of more than two minutes in length that were minimized. *United States v. Gordon*, 871 F.3rd 35, 49 (1st.

5

Cir. 2017); citing *U.S. v. Delacruz-Suarez,* 601 F.3d 1202, 1215 (11th Cir. 2010); *U.S. v. Yarbrough*, 527 F.3d 1092, 1098 (10th Cir. 2008; *U.S. v. Rivera*, 527 F.3rd 891, 905 (9th Cir. 2008). Courts will provide agents with more leeway when the challenged interceptions occurred earlier in the wiretap investigation while the monitoring agents were attempting to identify the members of the conspiracy and the jargon in which they communicate, *U.S. v. Scott*, 436 US at 141.

From March 14, 2019 through March 25, 2019 agents intercepted a total of 937 telephone calls. Of those calls, only 120 were longer than two minutes in length. Of those 120 phone calls, 58 were ultimately determined to be non-pertinent and of those 58 non-pertinent phone calls lasting longer than two minutes, the monitoring agent minimized 38 of the calls. Therefore, from March 19 through March 25 agents minimized at least 66% of the non-pertinent calls that were longer than two minutes in duration.

Since the criminal activity that was the subject of the wiretap concerned both multi-state drug dealing and the illegal acquisition and possession of firearms, "the need to allow latitude to the eavesdroppers is close to its zenith." *United States v. Hoffman* 832 F.2nd at 1308, see also *United States v. Quintana* 508 F.2nd 867, 874 (7th Cir. 1975), finding "large and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode." Here, the agents were confronted within the first five days of the institution of the wiretap with clear evidence of the planning of a home invasion/robbery. Over the next nine days these discussions evolved from planning to traveling to the scene in order to commit the crime. I find that the monitoring agents listening to, and consideration of the above calls did not violate their minimization responsibilities.

### B. Exigent Circumstances

The Fourth Amendment requires the government to obtain a warrant upon probable cause to search or seize the property of a United States Citizen. *See* U.S. CONST. amend. IV. "One well-recognized exception" to the Fourth Amendment search warrant requirement "applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable." *Carpenter v. United States,* 138 S. Ct. 2206, 2222 (2018). The test for determining the existence of exigent circumstances "is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a

warrant." *United States v. Adams*, 621 F.2d 41, 44 (1st Cir. 1980).  In making such a determination "[p]roof of exigent circumstances should be supported by particularized, case-specific facts, not simply generalized suppositions about the behavior of a particular class of criminal suspects." *United States v. Samboy*, 433 F.3d 154, 158 (1st Cir. 2005) (*citing United States v. Hidalgo*, 747 F.Supp. 818, 828 (D.Mass.1990)) (internal quotation marks omitted). Circumstances presenting "[s]uch exigencies could include the need to prevent the imminent destruction of evidence in individual cases, to pursue a fleeing suspect, and to assist persons who are seriously injured or are threatened with imminent injury." *Riley v. California*, 573 U.S. 373, 402 (2014).

  Defendants argue the government's acquisition of CSLI data was impermissible because the facts do not support a finding of exigent circumstances sufficient to circumvent the warrant requirement. (Def.'s Mot. to Suppress Evid. At 2). However, the court extended the application of the exigent circumstances doctrine to cover circumstances where law enforcement officers are assisting persons who "are threatened with imminent injury." *Riley*, 573 U.S. at 402. Furthermore, CSLI is among the type of information which is obtainable without a warrant if the exigent circumstances doctrine applies. *See Carpenter*, 138 S. Ct. at 2222; *U.S. v. Saemisch*, 371 F. Supp. 3d 37, 42 (D. Mass. 2019).

  In *Carpenter*, the United States Supreme Court held acquisition of historical CSLI constitutes a search for which the government must "generally obtain a warrant" because of the consequences on a defendant's "legitimate expectation of privacy in the record of his physical movements." *Carpenter*, 138 S. Ct. at 2217, 2221. However, the Court explicitly noted that its holding was "narrow" reserving judgment on matters such as "real time CSLI." *Id.* at 2220.  The Court then went on to indicate that "case-specific exceptions may support a warrantless search of an individual's cell-site records under certain circumstances" including when the "exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Id.* at 2222–23 (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)) (internal quotation marks omitted). Concluding that "as a result, if law enforcement is confronted with an urgent situation, [certain] fact-specific threats will likely justify the warrantless collection of CSLI." Id. at 2223.

In *United States v. Saemisch*, the United States District Court held "one such circumstance" existed and applied the exigent circumstances doctrine to uphold a "warrantless acquisition of the defendant's real-time CSLI." *Saemisch*, 371 F. Supp. 3d at 42. There, the government intercepted communications where the defendant bragged "about his abuse of children and expressed what could reasonably be understood as an apparent intention to repeat that abuse." *Id.* at 43. The court reasoned the warrantless collection of real-time CSLI was reasonable because the exigent circumstances "supported an objectively reasonable belief that the defendant posed a potentially imminent threat to the safety of identified minor children." *Id*. at 42.

Defendants' actions, in this case, present analogous circumstances under which there is a compelling necessity for immediate action to assist identified individuals threatened with imminent injury. (*See* U.S.' Resp. in Opp'n to Def.'s Mot. to Suppress Evid. at 3–5). As such, exigent circumstances necessitated the government's procurement of Defendants' CSLI without a warrant because there was a reasonable belief that Defendants posed an imminent threat to the individuals who could be occupying the home they intended to rob. *See Riley*, 573 U.S. at 402; (*Id.*).

This reasonable belief is based on the phone calls between March 19th and 25th that revealed the men were conspiring to commit a home invasion and armed robbery. Thereafter, the discussions of Defendants, especially the discussions on March 25th indicated that the planning phase of the robbery had ended and the execution phase of crime was commencing. The government was justified in their belief that Defendants' actions posed a threat of imminent injury, and the exigencies justified the warrantless acquisition of real time CSLI data.

## **Conclusion**

For the reasons set forth above, the Defendants' motions to suppress the intercepted telephone communications and cell site location information is denied.

/s/Timothy S. Hillman
TIMOTHY S. HILLMAN
U.S. DISTRICT JUDGE
