**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ———————————————— ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| v. ) | Crim. No. 19-CR-40024-TSH |
| ) | |
| GRACE KATANA, ) | |
| ) | |
| Defendant ) | |
| ———————————————— ) | |

**DEFENDANT GRACE KATANA'S MEMORANDUM**
**OF LAW IN SUPPORT OF HIS MOTION FOR A JUDGMENT**
**OF ACQUITTAL, OR IN THE ALTERNATIVE, FOR A NEW TRIAL**

**Introduction**

On July 2, 2019, a grand jury in the District of Massachusetts indicted Defendant Grace Katana and three other defendants[1] on one count of conspiracy to interfere with interstate commerce by robbery in violation of 18 U.S.C. § 1951 (the "Hobbs Act"). The Indictment alleges that Mr. Katana conspired with his three co-defendants and others "to obstruct, delay and affect interstate commerce and the movement of articles and commodities in commerce by the robbery of Person #1, an individual residing in Rockland, Massachusetts who was engaged the sale of custom glass smoking devices." *See* Indictment (DE 22).[2]

After two of Mr. Katana's co-defendants pled guilty, *see* DE 374, 378, and the third defendant was severed from his case, *see* DE 379, the government's case against Mr. Katana proceeded to a jury trial commencing on May 31, 2022. At the close of the government's case,

---

[1] Mr. Katana's three co-defendants were Junior Melendez, Keith Johnson and Shaun Walker. *See* DE 22 (Indictment). Mr. Johnson was separately charged in Count Two of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1).

[2] "DE __" refers to the relevant docket entry in this matter.

Mr. Katana moved for a judgment of acquittal pursuant to Rule 29(a) of the Federal Rules of

Criminal Procedure.  *See* DE 400.  At that time, the Court reserved its decision on Defendant's

Motion pursuant to Rule 29(b).  Separately, Mr. Katana objected to certain of the Court's

proposed jury instructions, including objections contending that portions of those proposed jury

instructions constructively amended the Indictment in this case.  *See, e.g.*, DE 397, 398.  The

Court overruled those objections and proceeded to instruct the jury in a manner consistent with

those proposed instructions, after which Mr. Katana renewed his objections.

On June 7, 2022, the jury returned a verdict finding Mr. Katana guilty on the single

Hobbs Act conspiracy charge.  *See* DE 403.  After the verdict was returned, the Court denied Mr.

Katana's earlier-filed Motion for a Judgment of Acquittal.  *See* DE 405.

Pursuant to Rules 29(c) and 33 of the Federal Rules of Criminal Procedure, Mr. Katana

now moves for an Order entering a judgment of acquittal in his favor or, in the alternative, for a

new trial in this case.  As explained below, a judgment of acquittal in favor of Mr. Katana should

enter because the United States failed to present evidence at trial sufficient to sustain a

conviction on the sole charge asserted against Mr. Katana in this case: conspiracy to interfere

with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a).  In addition, the

Court's instructions to the jury, as well as the government's closing and rebuttal arguments,

constructively amended the Indictment in this case in violation of Mr. Katana's rights under the

Fifth and Sixth Amendments to the United States Constitution.  That serious error separately

requires entry of a judgment of acquittal or, at a minimum, an order requiring a new trial of this

matter.  Finally, the evidence presented by the government at trial amounted to a prejudicial

variance that dramatically undermined Mr. Katana's substantive rights in this proceeding.  For

that additional reason, a judgment of acquittal should enter in Mr. Katana's favor or, at a minimum, a new trial should be ordered.

## STANDARD OF REVIEW

In assessing the sufficiency of the evidence in a criminal case, this Court must consider "whether the evidence, viewed in the light most favorable to the prosecution, would permit a rational jury to find each essential element of the crime charged beyond a reasonable doubt." *United States v. Frigerio-Migiano*, 254 F.3d 30, 33 (1st Cir. 2001) (citing *United States v. Zanghi*, 189 F.3d 71, 79 (1st Cir. 1999) (internal quotations omitted)); *accord United States v. Weed*, 873 F.3d 68, 72 (1st Cir. 2017). In order to establish the requisite elements, the government is entitled to rely upon circumstantial evidence. *United States v. Perez-Melendez*, 599 F.3d 31, 45 (1st Cir. 2010). A jury's conclusions, however, may not be a "product of pure speculation." *Id.* "This is particularly true when one considers that the burden is proof *beyond a reasonable doubt.*" *Id.* (original emphasis).

A constructive amendment of an Indictment occurs "when the charging terms of the indictment are altered, either literally or in effect, by the prosecution or court after the grand jury has passed upon them." *United States v. de Leon-De La Rosa*, 17 F.4th 175, 196 (1st Cir. 2021) (quoting *United States v. DeCicco*, 439 F.3d 36, 43 (1st Cir. 2006) (internal quotations omitted)). The First Circuit has explained that a constructive amendment may occur through "a jury instruction which modifies the offense charged." *United States v. Dunn,* 758 F.2d 30, 35 (1st Cir. 1985); *see also de Leon-De La Rosa*, 17 F.4th at 198 (explaining that a trial court had committed a "clear and obvious error" when its jury instruction erroneously broadened the possible bases for a conspiracy conviction from the single basis set forth in the Indictment). When a constructive amendment occurs, a defendant who timely objects need not demonstrate any

3

prejudice, as prejudice is presumed. *United States v. DeCicco*, 439 F.3d 36, 43 (1st Cir. 2006); *see also United States v. Fisher*, 3 F.3d 456, 463 (1st Cir. 1993) ("A constructive amendment is considered prejudicial *per se* and grounds for reversal of a conviction."). Accordingly, when a constructive amendment occurs, the underlying conviction must be vacated. *Id.* Where the evidence presented at trial would have been insufficient to support a conviction under the proper scope of the Indictment, a judgment of acquittal should enter. *See United States v. Chambers*, 408 F.3d 237, 247 & n.6 (5th Cir. 2005). Some federal courts have held that where there is evidence within the proper scope of the Indictment which could support a verdict, a new trial may be ordered. *Id.*

A variance occurs when the facts proved by the government at trial are different from those alleged in the Indictment. *See United States v. Mangual-Santiago*, 562 F.3d 411, 421 (1st Cir. 2009). A variance is grounds for reversal of a conviction if it causes "unfair prejudice" to the defendant. *United States v. Dellosantos*, 649 F.3d 109, 116 (1st Cir. 2011). "Unfair prejudice" occurs where the variance affects the "substantial rights" of the defendant, including a defendant's right to have "to have sufficient knowledge of the charge against him in order to prepare an effective defense and avoid surprise at trial." *United States v. Tormos-Vega*, 959 F.2d 1103, 1115 (1st Cir. 1992).

## **BACKGROUND**

Mr. Katana was charged in the Indictment with a single count of conspiracy to obstruct, delay and affect interstate commerce "by the robbery of Person #1, an individual residing in Rockland, Massachusetts who was engaged in the sale of custom glass smoking devices," in violation of 18 U.S.C. § 1951(a). *See* Indictment (DE 22). At trial, the government contended,

the parties agreed, and the evidence established that Person #1 was Joseph Wilson.  *See, e.g.,* DE 397 at Exhibit A.

At the time of the alleged conspiracy (March 2019), Mr. Wilson resided with his then-girlfriend, Jennifer O'Brien, at 6 French Road in Rockland, Massachusetts.  At trial, Mr. Wilson testified that he operated a glass art business out of the 6 French Road address, and that he periodically bought and sold glass items to and from individuals located in states outside of Massachusetts.  However, there was no evidence presented at trial indicating that Mr. Katana or any of his alleged co-conspirators were aware of either (1) the existence of Mr. Wilson's glass art business, or (2) the fact that Mr. Wilson operated the glass art business from the residence at 6 French Road in Rockland, Massachusetts.  Rather, the evidence presented at trial indicated that Mr. Katana and his alleged co-conspirators appear to have targeted the 6 French Road address because it was located "in a rich, rich-ass neighborhood," *see* Exhibit 53, and because "the neighborhood's sweet."  *See* Exhibit 63.

The crux of the government's case against Mr. Katana at trial was a series of recorded telephone calls that occurred between March 18, 2019, and March 25, 2019.  On those telephone calls, Mr. Katana and his various alleged co-conspirators (Messrs. Melendez, Johnson, and Walker) allegedly discussed a possible break-in of Mr. Wilson's residence at 6 French Road. Mr. Katana participated in several of those recorded telephone calls, *see* Exhibits 52, 55-57, and he was not a participant in other calls.  *See* Exhibits 50-51, 53-54, 58-63.

The evidence at trial also showed that between March 23, 2019, and March 26, 2019, Mr. Wilson had left his residence in Rockland to go on a snowboarding trip to Sunday River, Maine. Both Mr. Wilson and Ms. O'Brien testified that multiple people were aware that he was on an out-of-state snowboarding trip during those dates, and Mr. Wilson acknowledged that he began

posting publicly on social media about the trip (including shots of himself snowboarding and in the mountains) as early as March 24, 2019.  Mr. Wilson testified that it "would not have been very hard" for someone to figure out that he was out of town.

In the early morning hours of March 25, 2022, Mr. Katana and Mr. Melendez spoke several times by telephone.  *See* Exhibits 55, 56.  During one of those calls, Mr. Katana told Mr. Melendez that he had Mr. Wilson's "schedule," and that "he" (Mr. Wilson) was "in M—."[3] *See* Exhibit 56.  Thereafter, in the early afternoon of March 25, 2019, Mr. Katana and Mr. Melendez travelled by car to Rockland and drove to the neighborhood where 6 French Road was located. *See* Exhibits 6, 7.  Once there, the evidence indicated that Mr. Katana left the car, approached the front door of 6 French Road by foot, and stole several cardboard boxes from the front doorstep before returning to the car.  *See* Exhibits 8, 9.  Although there was one car in the driveway at the time Mr. Katana approached the house, the car was not Mr. Wilson's vehicle.

The evidence showed that Mr. Katana and Mr. Melendez then travelled together by car to a nearby Home Depot to meet with Mr. Walker and Mr. Johnson, who had separately travelled to Rockland in a different car.  At the Home Depot, Mr. Katana and Mr. Melendez purchased a crowbar, several razor blades, and a screwdriver.  Exhibit 10.  While inside the Home Depot, Mr. Melendez called Mr. Walker and told him that Mr. Katana had gone "to the door" of the home, but that he had not "look[ed] in the window."  Exhibit 63.  Melendez also stated that the lights in the house were "off" and that he "don't think anybody there."  *Id.* Mr. Melendez added that Mr.

---

[3] The recording is unclear regarding precisely where Mr. Katana said Mr. Wilson was, but Agent Ventetuolo acknowledged during his testimony that Mr. Katana's appears to be saying something that sounds like "Maine."

Katana was "trying to call his other man now to see." *Id*. He concluded the call by stating "We're gonna look. . . We're gonna tell you and make the decision after that." *Id*.

Shortly after leaving the store, Mr. Katana and Mr. Melendez were stopped by law enforcement officers in the Hope Depot parking lot. They were temporarily detained and their car was searched before they were released. Inside the car, police saw a single black ski mask, as well the two boxes that had been taken from the doorstep of 6 French Road. Law enforcement officers also stopped Mr. Johnson and Mr. Walker, who were in a different car located in a different area of the Home Depot parking lot. Mr. Johnson and Mr. Walker were arrested after police located a firearm in the passenger seat glove box of their car. The government offered no evidence at trial indicating that Mr. Katana was ever aware of the presence of the gun in the car in which Walker and Johnson had travelled.

## ARGUMENT

### A. There Was Insufficient Evidence Presented at Trial to Support Mr. Katana's Conviction.

In order to convict Mr. Katana of participating in a Hobbs Act conspiracy in violation of 18 U.S.C. § 1951(a) as charged in the Indictment, the government was required to prove beyond a reasonable doubt, *inter alia,* that Mr. Katana willfully agreed to join a conspiracy to affect interstate commerce by committing a "robbery" of Mr. Wilson. The Hobbs Act defines "robbery" as "the unlawful taking or obtaining personal property *from the person or in the presence of another*, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining. 18 U.S.C. § 1951(b) (emphasis added). Federal courts have routinely interpreted this provision in a manner consistent with the common-law definition of

"robbery," which requires that the wrongful taking or obtaining of the property be either directly from the person of the alleged victim or occur in the presence of the victim. *See* First Circuit Model Criminal Jury Instructions, No. 4.18.1951 (requiring proof that the defendant "knowingly and willfully obtained property *from [person or corporation robbed]"*) (emphasis added); *see also, e.g.,* Third Circuit Model Criminal Jury Instructions, No. 6.18.1951 (requiring proof that the defendant "took from *(the victim alleged in the indictment)* the property described in Count *(No.)* of the indictment) (original emphasis); Seventh Circuit Model Criminal Jury Instructions, § 1951 (requiring proof "that the defendant knowingly obtained money or property *from or in the presence of [name of victim]*") (emphasis added).

Indeed, the United States Department of Justice's Criminal Resource Manual makes clear that a Hobbs Act "robbery" requires proof that the defendant took or obtained property "from the person of" or "in the presence of" the "owner or possessor of [the] property." *See* United States Department of Justice, Criminal Resource Manual § 2406 (Form Indictment—Interference with Commerce by Robbery), *located at https://www.justice.gov/archives/jm/ criminal-resource-manual-2406-form-indictment-interference-commerce-robbery-18-usc-1951*. That language is consistent with the common-law meaning of the term "robbery." *See* Black's Law Dictionary (11th Ed. 2019) (defining "robbery" as "The illegal taking of property *from the person of another, or in the person's presence*, by violence or intimidation.") (emphasis added); *see also* 50 Am. Jur. 2d § 10 (explaining that "larceny" is distinguished from "robbery" by the fact that, "unlike robbery, the property need not be taken from the person or in the presence of the victim").

Thus, it was not enough in this case for Mr. Katana to have entered into an agreement with others to commit a "larceny" or a "theft" by means of a mere break-in or a burglary of the property at 6 French Road in Rockland. Rather, the government was required to prove beyond a

reasonable doubt that Mr. Katana willfully entered into an agreement with others to commit an unlawful taking of property either from Mr. Wilson's person or in his presence.  18 U.S.C. § 1951(b)(1).  Mr. Katana further contends that the government was required to prove beyond a reasonable doubt that he agreed with at least one other co-conspirator that the proposed robbery would "obstruct, delay or affect" interstate commerce.  *Id.*  As explained below, the government failed to present sufficient evidence at trial to satisfy these burdens.

1. **There Was Insufficient Evidence to Establish that Mr. Katana Ever Knew or Believed that Mr. Wilson Would be Present at the Targeted Address.**

As an initial matter, the government has not presented sufficient evidence to support a conclusion that Mr. Katana knew and agreed with any other persons that the planned theft would occur from the person of or in the presence of the alleged victim, Mr. Wilson.  To the contrary, the evidence presented at trial makes clear that neither Mr. Katana nor any of his alleged co-conspirators believed that Mr. Wilson (the alleged target of the robbery conspiracy described in the Indictment), would be at 6 French Road at the time of the planned break-in.

As noted above, there is no dispute that the target of the alleged robbery, Joseph Wilson, was in fact away in Sunday River, Maine on a snowboarding trip on March 25, 2019, the date of the planned break-in.  At trial, Mr. Wilson and others, including both Jennifer O'Brien and Special Agent Christopher Scott, testified that Mr. Wilson had publicized his snowboarding trip on his various social media accounts.  Mr. Wilson further testified that multiple individuals were aware that he was going to be (and, in fact, was) away from Rockland on March 25, 2019, and that it "wouldn't have been hard" for anyone to discern that he was going to be away on that date.  Mr. Wilson also testified that he drove his own car to Maine for the trip, and that his car was therefore not in the driveway at 6 French Road on the date of the planned break-in.

9

More importantly, the evidence presented at trial clearly indicates that Mr. Katana himself believed that Mr. Wilson was away from 6 French Road on March 25, 2019, the date of the planned break-in.  In a call made at 2:04 a.m. on that day, Mr. Katana informed Mr. Melendez that he had Mr. Wilson's "schedule" and that "he" (referring to Mr. Wilson) is "in M—."  *See* Exhibit 56.  At 1:07 p.m. on that same day, Mr. Melendez told Mr. Johnson "he (Mr. Wilson) [is] probably not even there."  Exhibit 61.  Accordingly, not only did the government fail to present any evidence to satisfy its burden to show that Mr. Katana believed that Mr. Wilson would be at the targeted address, the evidence that was presented at trial indicated the opposite.

Nor did Mr. Katana's in-person visit to the 6 French Road address (when he stole the two shipping boxes from the doorstep) confirm to him or to any of his alleged co-conspirators whether anyone (let alone the alleged "robbery" target, Mr. Wilson), was present at that address on that date.  Indeed, in a call that occurred *after* that visit, Mr. Melendez told Mr. Walker that, while there is one car in the driveway,[4] he doesn't "think anybody [is] there," and that the "lights [are] off."  *See* Exhibit 63.  Mr. Melendez also tells Mr. Walker that Mr. Katana is "trying to call his other man right now to see" whether anyone is present at the address.  Exhibit 63.  Given this evidence, which indicated that neither Mr. Katana nor any of his alleged co-conspirators believed that Mr. Wilson or anyone else was at the residence at the time, there is simply insufficient evidence to support a conclusion beyond a reasonable doubt that Mr. Katana ever agreed with any of those other individuals to commit a "robbery" from the person of, or in the presence of

---

[4] Mr. Melendez's actual language is that "There's one whip in the parking lot."  *See* Exhibit 63. The evidence indicates, however, that "whip" refers to a car, and "parking lot" refers to a driveway.

Mr. Wilson.  To the contrary, the evidence establishes, at best, that Mr. Katana and the others were planning a break-in or a burglary of the residence at 6 French Road in Rockland.

The decision in *United States v. Acosta*, 595 F. Supp. 2d 282 (S.D.N.Y. 2009) is instructive here.  In that case, the trial court granted a motion for judgment of acquittal in a Hobbs Act robbery case where the evidence showed that the defendant understood that the plan was "to break into [the victim's] empty house and search for cash." *Id.* at 293.  The *Acosta* court reasoned that, at most, the defendant—who had told the other participants that the house would be empty—had aided and abetted a "burglary" not a "robbery" as required for a Hobbs Act conviction. *Id.*  In reaching this conclusion, the *Acosta* court distinguished the facts of the case from other cases where defendants "knew" that they would be interacting with potential victims. *Compare United States v. Santos*, 449 F.3d 93, 103 (2d Cir. 2006) (defendants robbing individuals of drugs by impersonating federal agents knew they would be interacting with the potential robbery victims); *United States v. Skowronski*, 968 F.2d 242, 248 (2d Cir. 1992) (defendants engaging in theft at store during business hours knew that security guards and customers would be present at the time of the theft); s*ee also United States v. Nguyen,* 246 F.3d 52, 55 (1st Cir. 2001) (upholding Hobbs Act robbery conviction where defendant "knew" that targeted residence "was frequently occupied by family members and house guests").  The *Acosta* court also rejected the notion that the mere fact that one of the perpetrators had a weapon in his possession was sufficient to hold every member of the burglary crew liable for a "robbery," rather than a "burglary." *Acosta*, 595 F. Supp. 2d at 294-95.  What mattered was that, even

though the defendant in that case was aware of the presence of the firearm,[5] the defendant still "believed [the victim's] house would be empty." *Id.*

In this case, just as in *Acosta*, there is insufficient evidence that Mr. Katana ever knew that Mr. Wilson would be present at 6 French Road at the time of the planned break in. To the contrary, the evidence indicates that, just like the *Acosta* defendant, he understood and believed that Mr. Wilson was away and that the targeted residence would be empty. *See, e.g.,* Exhibit 56. For that reason, there is insufficient evidence to establish that Mr. Katana ever agreed to commit a "robbery" of Mr. Wilson, and the Court should enter a judgment of acquittal in favor of Mr. Katana on Count One.

### 2. There is Insufficient Evidence to Establish that Mr. Katana Was Aware of Mr. Wilson's Business Operations at 6 French Road, Rockland.

At trial, the government attempted to sidestep the uncontroverted evidence indicating that Mr. Katana had Mr. Wilson's schedule and knew he was away by advancing a new theory of prosecution: that the alleged conspiracy was to "rob" Mr. Wilson's glass art business, rather than to "rob" Mr. Wilson himself. *See* DE 399 at 4 (arguing that "Joseph Wilson's business," rather than Joseph Wilson, "is the victim" in this case). Relying upon the First Circuit model instruction that allows prosecution under the Hobbs Act for the robbery of a "corporation," *see* First Circuit Model Criminal Jury Instructions No. 4.18.1951, the government contended that Mr. Katana could be properly prosecuted and convicted for conspiring to rob that "glass art business" in the presence of *any* other person. *See* DE 399 at 3.

---

[5] In this case, by contrast, there is no evidence that Mr. Katana was ever aware of the presence of the firearm in the car driven by Walker and Johnson.

But even if that newly-advanced "business robbery" theory of prosecution were valid here (and it is not, *see infra* Parts B & C), the evidence presented by the government at trial fell far short of what would be required to sustain a conviction of Mr. Katana under that alternative theory.  Specifically, the government failed to present any evidence that Mr. Katana or any of his co-conspirators ever knew about or were otherwise aware of Mr. Wilson's supposed business operations at 6 French Road in Rockland.  Indeed, the government presented no evidence that Mr. Katana or any of the other alleged co-conspirators had ever interacted with anyone about that glass art business in any way.  For that additional reason, his conviction cannot stand.  *Compare Nguyen*, 246 F.3d at 54-55 (1st Cir. 2001) (upholding Hobbs Act conspiracy conviction arising from planned break-in to private home where government presented evidence that the defendant knew about business receipts being kept at targeted residence and conspirators "hoped to steal the earnings of [that business entity]").

### 3.   <u>There is Insufficient Evidence to Establish that Mr. Katana Knew or Believed that Anyone Would be Present at the Targeted Address at the Time of the Planned Break-In.</u>

Nor was there sufficient evidence to establish that Mr. Katana ever conspired with others to commit a "robbery" in the presence of someone other than Mr. Wilson at the 6 French Road address.[6]  Specifically, the evidence presented at trial was insufficient to support a conclusion beyond a reasonable doubt that Mr. Katana knew or believed that *anyone* was at the address at the time of the planned break in.  The government did not present evidence at trial sufficient to support a conclusion that Mr. Katana or his co-conspirators ever knew or believed that anyone

---

[6]Mr. Katana separately contends that the jury instructions that allowed the jury to convict him on Count One if he willfully joined an agreement to commit a "robbery of Mr. Wilson's property" in the presence of some other person was a constructive amendment of the Indictment.  *See infra* Part B; *see also* DE 397; DE 398.

other than Mr. Wilson resided at 6 French Road, and at no point during any of the recorded calls

did any of the alleged co-conspirators discuss any other possible residents of the house.

*Compare Nguyen*, 246 F.3D at 55 (defendant knew residence was "frequently occupied").

      Moreover, as discussed above, Mr. Katana had Mr. Wilson's "schedule" and he plainly

believed that he was away from the residence on the date and at the time of the planned break-in.

*See* Exhibit 56.  And even *after* Mr. Katana had visited the residence and had presumably seen a

car in the driveway, and may have heard music emanating from or near the residence, the

evidence shows that Mr. Katana and his alleged co-conspirators still didn't "think anybody [was]

there."  *See* Exhibit 63.  Thus, the evidence presented at trial failed to establish that Mr. Katana

ever agreed to commit a "robbery" in the presence of *anyone* in violation of the Hobbs Act.

*Acosta*, 595 F. Supp. 2d at 294-95.

      **4.**  **The Evidence Was Insufficient to Establish the Required Agreement.**

      The government's failure of proof in this case was not limited to its failure to present

evidence that Mr. Katana agreed to commit a "robbery" against Mr. Wilson or, for that matter,

against any other person or entity.  The recorded calls presented by the government at trial also

indicate that the participants in the alleged Hobbs Act conspiracy never reached *any* agreement

regarding whether they would attempt to break into the house at 6 French Road at all.  Indeed,

during the final call before the participants were stopped by police in the Home Depot parking

lot, Mr. Melendez tells Mr. Walker, "We're gonna look. . . .  We're gonna tell you and *make the*

*decision after that.*"  Exhibit 63.  Mr. Walker responds by saying "Alright." *Id.*  This recorded

exchange demonstrates that the alleged conspirators had not yet reached *any* agreement

regarding whether to commit *any* planned offense.  Thus, the government failed to prove the

existence of that alleged agreement beyond a reasonable doubt.  For that additional reason, the
Court should enter a judgment of acquittal in Mr. Katana's favor on Count One.

To be clear, the conduct reflected on the recorded calls and the other evidence gathered
by government investigation in this case is hardly flattering to Mr. Katana or to any of his
alleged co-conspirators.  But the government's burden at trial was not simply to establish that
Mr. Katana was knowingly engaged in some generalized form of wrongdoing.  *United States v.*
*Perez-Melendez*, 599 F.3d 31, 43 (1st Cir. 2010) ("knowledge that one is guilty of *some* crime is
not the same as knowledge that one is guilty of the crime *charged*) (quoting *United States v.*
*Nieves-Castano*, 480 F.3d 597. 601 (1st Cir. 2007)).  Nor was the government's burden satisfied
by mere proof that Mr. Katana and his alleged co-conspirators may have been planning to break
into or burgle the house at 6 French Road in Rockland.  As explained above, in order to convict
Mr. Katana in this case, the government was required to establish beyond a reasonable doubt that
Mr. Katana and his alleged co-conspirators entered into an agreement to commit a "robbery."
On that score, the government's evidence fell far short of the mark.  And, as Exhibit 63 makes
abundantly clear, at the time they were arrested by the police, the alleged co-conspirators not
only were unsure regarding whether anyone was present at the residence, they had not yet made
any "decision" about whether they would proceed with *any* effort to steal anything from the
house.   On the basis of this evidence, no rational jury could have concluded that Mr. Katana
joined an agreement with anyone to commit a "robbery" of Mr. Wilson (or anyone else) as
defined by 18 U.S.C. § 1951(a).  A judgment of acquittal is therefore required.

### 5. <u>There is Insufficient Evidence to Establish that Mr. Katana Ever Agreed to Obstruct, Delay or Affect Interstate Commerce.</u>

Finally, the government in this case bore the additional burden of proving beyond a
reasonable doubt that Mr. Katana also agreed with his co-conspirators to affect interstate

commerce.  The government's evidence in this case did not come close to satisfying this requirement.

Defendant acknowledges that where a defendant has been charged with committing a substantive violation of the Hobbs Act, the First Circuit has not imposed a requirement that the defendant know that the robbery had the effect of "obstructing, delaying or affecting interstate commerce."  *See, e.g., United States v. Rivera-Rivera*, 555 F.2d 277, 280 (1st Cir. 2007).  Rather, the First Circuit requires only that the government prove that the robbery "created a realistic probability of a de minimus effect on interstate commerce.  *Id.*; *see also, e.g., United States v. Capozzi*, 347 F.3d 327, 334-36 (1st Cir. 2003).  Undersigned counsel further acknowledges controlling adverse caselaw indicating that this same rule applies in the context of a Hobbs Act conspiracy.  *See, e.g., United States v. Turner*, 501 F.3d 55, 59 (1st Cir. 2007) (rejecting a challenge to the jury instruction imposing the same minimal interstate commerce requirement in a Hobbs Act conspiracy case); *see also*, *e.g.*, *United States v. Valentini*, 944 F.3d 345, 351 (1st Cir. 2019) (rejecting sufficiency challenge to interstate commerce element in Hobbs Act conspiracy case).

Mr. Katana respectfully submits, however, that in a Hobbs Act conspiracy context, there must be some minimal requirement that the defendant understand that the planned conduct would have that requisite "minimal" effect on interstate commerce.  Such a requirement is not only consistent with the plain language of 18 U.S.C. § 1951, but would also ensure that the Hobbs Act is not unduly expanded to conduct far outside its intended reach.  Indeed, given that Hobbs Act conspiracies do not require proof of any overt act, *see United States v. Monserrate-Valentin,* 729 F.3d 31, 45 (1st Cir. 2013), a failure to require proof that the defendant have at least some understanding that the plan would affect interstate commerce, even minimally, would

threaten to convert nearly *every* robbery conspiracy into a Hobbs Act violation. *See United States v. Cruz-Rivera*, 357 F.3d 10, 14 (1st Cir. 2004) (noting that "[t]here are significant and interesting questions about whether mere robbery from a private house of monies derived from the owner's interstate business would be sufficient to create a federal crime"); *cf. Nguyen*, 246 F.3d at 54 (explaining that Hobbs Act conspiracy involving robbery of a private home required proof that defendant "entered a conspiracy whose *objective* was to steal the assets of an entity in interstate commerce") (emphasis added).

In this case, the government did not present any evidence that Mr. Katana and his co-conspirators ever knew or believed that any "robbery" of Mr. Wilson (or any other person or entity) located at the 6 French Road residence would have *any* affect on interstate commerce. As noted above, there is no evidence that they were aware that Mr. Wilson engaged in any business activities at his residence at 6 French Road, and the government presented no evidence at trial from which a jury could have inferred that Mr. Katana or any other co-conspirators ever knew or intended that their alleged plan would impact or affect any business activities, or otherwise would have had any other impact on interstate commerce. *Compare Nguyen*, 246 F.3d at 54. For that additional reason, the Court should enter a judgment of acquittal in favor of Mr. Katana.

**B.** **The Court's Jury Instructions and the Government's Closing and Rebuttal Arguments Constructively Amended the Indictment.**

At trial, the Court instructed the jury that, in order to find Mr. Katana guilty of the offense with which he was charged, it must find:

> **First, that the agreement specified in the Indictment, and not some other agreement or agreements, existed between at least two people to commit *a robbery of Mr. Wilson's property* that would have had the effect of obstructing, delaying or affecting interstate commerce: . . .**

*See* Final Jury Instructions (circulated by the Court on June 3, 2022) at 20 (emphasis added).

Elsewhere in its instructions, the Court informed the jury that the government was required to

prove beyond a reasonable doubt that Mr. Katana agreed, *inter alia*, **"to obtain _the property of_**

**_Mr. Wilson_ by means of a robbery."**  *Id.* at 18 at 18 (emphasis added).  The Court also

instructed the jury as follows:

> **The term "Robbery" means unlawfully taking or obtaining**
> **of personal property from the person or in the presence of another,**
> **against his _or her_ will, by means of actual or threatened force, or**
> **violence, or fear of injury, immediate or future, to his _or her_ person**
> **or property, or property in his _or her_ custody or possession, or the**
> **person or property of a relative or family member of his family or**
> **of anyone in his _or her_ company at the time of the taking or obtaining.**

*Id.* at 19 (emphases added).

These erroneous instructions constructively amended the Indictment in this case and

require reversal of Mr. Katana's conviction.  As an initial matter, "a robbery of Mr. Wilson's

property" is *not* the "agreement specified in the Indictment," as the Court's instructions stated.

To the contrary, the Indictment in this case charged Mr. Katana with participating in a

conspiracy "to obstruct, delay and affect interstate commerce . . . *by the robbery of Person #1.*"

*See* Indictment (DE 22).  By instructing the jury that, in order to find Mr. Katana guilty in this

case, it must find that he willfully joined in an agreement "to commit a robbery of Mr. Wilson's

property," the Court authorized the jury to convict Mr. Katana of an offense wholly separate

from and different than the offense with which he was charged.  The Court's use of the phrases

**"the property of"** and **"or her"** from pages 18 and 19 of the jury instructions similarly

mischaracterized the charge against Mr. Katana in the Indictment and allowed the jury to convict

Mr. Katana of conduct other than a conspiracy to commit a "robbery" of Person #1, Mr. Wilson.

As the First Circuit has explained, such an instruction is a clear error of law.  *See United States v. de Leon-De La Rosa*, 17 F.4th 175, 196-201 (1st Cir. 2021).

Nor is the distinction between a "robbery of Mr. Wilson" and a "robbery of Mr. Wilson's property" an insignificant one.  As federal courts have repeatedly explained, the term "robbery" set forth in the Hobbs Act is to be interpreted in a manner that is consistent with the common law definition of "robbery": the unlawful taking of property from the person of or in the presence of the victim.  *See United States v. Melgar-Cabrera*, 892 F.3d 1053, 1064 (10th Cir. 2018) ("Hobbs Act robbery is defined as common law robbery that affects interstate commerce."); *United States v. Harrington*, 108 F.3d 1460, 1471 (D.C. Cir. 1997) (looking to common law of robbery in Hobbs Act case); *United States v. Farmer*, 73 F.3d 836, 842 (8th Cir. 1996) ("[R]obbery is defined in § 1951(b)(1) in terms consistent with the traditional common law definition.").  Indeed, at common law, "robbery" is considered an offense *against a person*, while "larceny" or "theft" are considered offenses *against property*.  *See* 50 Am. Jur. 2d § 10, *Distinction Between Larceny and Robbery* (explaining that "larceny" is distinguished from "robbery" by the fact that, "unlike robbery, the property need not be taken from the person or in the presence of the victim."); *see also Stokeling v. United States*, 139 S. Ct. 544, 550 (2019) (discussing the distinction between the common law offenses of "robbery" and "larceny"); Black's Law Dictionary, (11th Ed. 2019), (defining "robbery" as "[t]he illegal taking of property *from the person of another, or in the person's presence*") (emphasis added).  Thus, as a matter of law, a Hobbs Act "robbery" *cannot* be committed against property.  In this case, the Indictment elected to identify that person as "Person #1, whom the parties agreed is Mr. Wilson.  *See* Indictment, Count One; *see also* DE 397 at Exhibit A (Joint Statement of the Case).

Moreover, as discussed above, the various federal Model Jury Instructions regarding the Hobbs Act make clear that *any* charged "robbery" under the Hobbs Act requires proof that the robbery be directed at the person or entity being robbed—not merely the property being taken. *See* First Circuit Model Criminal Jury Instructions, No. 4.18.1951 (requiring proof that the defendant "knowingly and willfully obtained property *from [person or corporation robbed]"*) (emphasis added); *see also, e.g.,* Third Circuit Model Criminal Jury Instructions, No. 6.18.1951; Seventh Circuit Model Criminal Jury Instructions, § 1951; United States Department of Justice, Criminal Resource Manual § 2406 (Form Indictment—Interference with Commerce by Robbery), *located at* *https://www.justice.gov/archives/jm/criminal-resource-manual-2406-form-indictment-interference-commerce-robbery-18-usc-1951*.

Accordingly, the Court's instructions—which permitted the jury to find Mr. Katana guilty if he willfully joined in an agreement "to commit a robbery of Mr. Wilson's property" were erroneous. The instructions both misstated the agreement that is charged in the Indictment, and separately created a substantial risk that the jury erroneously convicted Mr. Katana if he agreed only to conduct that amounts to a "larceny" of Mr. Wilson's property, rather than what the law requires: an agreement to commit a "robbery" of Mr. Wilson himself—the taking of property either directly from Mr. Wilson's person or in Mr. Wilson's presence.

More critically, the Indictment in this case does *not* charge Mr. Katana with participating in a conspiracy to "rob" *any other* individual or entity, such as Ms. O'Brien or Mr. Wilson's home-based business. If the government had possessed sufficient evidence to obtain an Indictment alleging those alternative conspiracies, it plainly could have elected to do so. The government chose instead, however, to allege a narrow conspiracy that focused exclusively on a proposed "robbery of Person #1." *See* Indictment (DE 22); *see also de Leon-De La Rosa*, 17

F.4th at 197 (explaining that "the fact that the government *could* have indicted [the Defendant] for [an alternative theory of liability] does not change the fact that the government did not") (original emphasis).

A constructive amendment of an Indictment occurs "when the charging terms of the indictment are altered, either literally or in effect, by the prosecution or court after the grand jury has passed upon them." *de Leon-De La Rosa*, 17 F.4th at 196 (quoting *United States v. DeCicco*, 439 F.3d 36, 43 (1st Cir. 2006) (internal quotations omitted)). The First Circuit has explained that a constructive amendment can occur through "a jury instruction which modifies the offense charged." *United States v. Dunn,* 758 F.2d 30, 35 (1st Cir. 1985). Indeed, in *de Leon-De La Rosa*, the First Circuit determined that the District Court had committed a "clear and obvious error" when its jury instruction erroneously broadened the possible bases for a conspiracy conviction from the single basis set forth in the Indictment. *de Leon-De La Rosa*, 17 F.4th at 198. The First Circuit reached this conclusion even though the alternative theory on which the Court had instructed the jury would have been legally valid had it been included in the Indictment. The Court explained that the express language of the Indictment had necessarily "limited" the scope of the charges against the defendant. *Id.* at 197. As a result of the improperly broad instruction, the *de Leon-De La Rosa* court vacated the defendant's conviction. *Id.* at 200-01.[7]

---

[7] The *de Leon-De La Rosa* Court separately considered whether the defendant in that case had satisfied the plain error standard under *United States v. Brandeo*, 539 F.3d 44, 47 (1st Cir. 2008). That standard does not apply here, as Mr. Katana timely objected to the proposed draft instruction. *See, e.g.,* DE 397, 398. It is worth noting however, that in finding plain error, the First Circuit emphasized that the purpose of the strict prohibition on constructive amendments is rooted in a defendant's rights under the Fifth and Sixth Amendments, which are "at the very core of our criminal justice system." *de Leon-De La Rosa*, 17 F.4th at 200. The court explained that "[u]ndermining these principles by allowing a constructive amendment would . . . seriously impair the fairness and integrity of the judicial proceeding." *Id.*

The First Circuit's recent decision in *de Leon-De La Rosa* specifically references the Supreme Court's landmark decision in *Stirone v. United States*, 361 U.S. 212 (1960), in which the Supreme Court first established the rule that a constructive amendment occurs when jury instructions "broaden[ ] the possible bases for conviction form that which appeared in the indictment." *See de Leon-De La Rosa*, 17 F.4th at 196 (quoting *United States v. Miller*, 471 U.S. 130, 138 (1985)).  Like this case*, Stirone* involved a defendant charged under the Hobbs Act. *Stirone*, 361 U.S. at 213-14.  The district court in *Stirone* had instructed the jury on two theories of prosecution, either one of which *could* have supported a Hobbs Act conviction.  *Id.*  Because the indictment had only included one of those theories, however, the *Stirone* Court found that the district court's instructions had improperly constructively amended the indictment, and it vacated the defendant's conviction.  *Id.* at 218-19; *see also de Leon-De La Rosa*, 17 F.4th at 197-98.

So too here.  The government in this case elected to indict Mr. Katana for conspiring to interfere with interstate commerce "by robbing Person #1 [Mr. Wilson]."  *See* Indictment, Count One. (DE 22)  It declined to expand the scope of that charged conspiracy to include a conspiracy to rob any other person or entity.  Nor does the Indictment charge Mr. Katana with conspiring to "rob" Mr. Wilson's glass art business in the presence of others.  And of course, the Indictment certainly does not charge Mr. Katana with a conspiracy to commit a mere "robbery of Mr. Wilson's property."  The Court's instructions, which changed the object of the charged conspiracy and dramatically broadened the possible bases of conviction by asking the jury to consider whether Mr. Katana agreed "to commit a robbery of Mr. Wilson's property," therefore improperly constructively amended the Indictment in this case.  *See de Leon-De La Rosa*, 17 F.4th at 197-98; *see also Stirone*, 361 U.S. at 213-14.

If that were not enough, the Court's erroneous constructive amendment of the Indictment through its instructions in this case was exacerbated by the government's closing and rebuttal arguments. During those arguments, government counsel seized upon the erroneous language in the Court's instructions and specifically encouraged the jury to consider an alternative theory by which Mr. Katana could be convicted of "robbing" Mr. Wilson's business in the presence of Ms. O'Brien. But of course that theory of prosecution is *nowhere* to be found in the Indictment. *See* Indictment, *passim.* The government's argument in this regard provides a separate basis for this Court to hold that the Indictment in this case was constructively amended. *See United States v. McBride*, 962 F.3d 25, 32 (1st Cir. 2020) (explaining that a constructive amendment can occur through a prosecution's argument to the jury).

Accordingly, the Court's instructions and the government's arguments constructively amended the Indictment and improperly allowed the jury to consider a "robbery" charge that was never considered by the grand jury and about which Mr. Katana was never provided proper notice. *See McBride*, 962 F.3d at 32 (explaining that the rule against constructive amendments "'exists to preserve the defendant's Fifth Amendment rights to indictment by grand jury, to prevent re-prosecution for the same offense in violation of the Sixth Amendment, and to protect the defendant's Sixth Amendment right to be informed of the charges against him'") (quoting *United States v. Valdez-Ayala*, 900 F.3d 20, 36 (1st Cir. 2018)). For that reason, his conviction in this case must be reversed and a judgment of acquittal should be entered in his favor. At a minimum, a new trial is warranted.[8]

---

[8] Defendant contends that because there is insufficient evidence to support the contention that Mr. Katana ever conspired to commit a "robbery" of Mr. Wilson as charged in the Indictment, *see supra* Part A, the appropriate remedy for the constructive amendment that occurred in this case is a judgment of acquittal. *See Chambers*, 408 F.3d at 247 & n.6. Alternatively, in the

**C. The Evidence Presented at Trial Amounted to a Variance That Unfairly Prejudiced Mr. Katana and Adversely Affected His Substantial Rights.**

Finally, even if this Court were to conclude that the Indictment was not constructively amended by its instructions and/or the government's closing and rebuttal arguments, it should still vacate Mr. Katana's conviction due to the prejudicial variance between the evidence presented at trial and the charge set forth in the Indictment.  Specifically, rather than present evidence regarding an alleged conspiracy to "rob" Mr. Wilson, as charged in the Indictment, the government's proof at trial instead focused instead upon an alleged conspiracy to "rob" Ms. O'Brien or (alternatively) to "rob" Mr. Wilson's home-based business in Ms. O'Brien's presence.   As noted above, neither of these theories are anywhere to be found in the Indictment. *See Dellosantos*, 649 F.3d at 116 (explaining that a "variance occurs when the crime charged remains unaltered, but the evidence adduced at trial proves different facts than those alleged in the indictment") (quoting *United States v. Mangual-Santiago*, 562 F.3d 411, 421 (1st Cir. 2009)).

Nor can there be any doubt that the government's advancement of these alternative theories of prosecution at trial unfairly prejudiced Mr. Katana and adversely affected his substantial rights.  *See United States v. DeCicco*, 439 F.3d 36, 47 (1st Cir. 2006).  The narrowly-drawn charge in the Indictment placed Mr. Katana on notice that he was being charged solely with conspiring to commit a "robbery of Person #1" and *not* a robbery of any other person or entity.  Indeed, throughout the course of the jury trial of this case, there was no dispute that the lone allegation levelled against Mr. Katana was that he participated in an alleged conspiracy "to rob Mr. Wilson."  For example, on the first day of trial, May 31, 2022, the parties submitted to the Court a Joint Statement of the Case which was read by the Court to the assembled pool of

---

event that this Court concludes that there was sufficient evidence to support the charge that was actually set forth in the Indictment, the Court could order a new trial.  *See Id.*

prospective jurors.  *See* DE 397 at Exhibit A.  That Joint Statement stated plainly that "[t]he government alleges that  . . . the defendant Grace Katana conspired with Junior Melendez, Keith Johnson, and/or Shaun Walker *to rob Joseph Wilson, a seller of glass smoking devices who lived in Rockland, Massachusetts.*"  *Id.* (emphasis added).  Nothing in that Joint Statement contended or suggested that the government was alleging that Defendant ever conspired with anyone to "rob" any other person or entity.

Given the narrowly-drawn charge levelled against Mr. Katana, his defense at trial focused intently on whether the evidence that was being presented by the government was sufficient to support the government's contention that Mr. Katana participated in an alleged conspiracy "to rob Mr. Wilson."  Mr. Katana's counsel highlighted the issue during his opening statement, and defense counsel's cross-examinations of nearly every government witness focused intently on information relating to the whereabouts of Mr. Wilson during the time of the alleged conspiracy, as well as Mr. Katana's knowledge of those whereabouts.  This focus was necessary to address whether Mr. Katana and his alleged co-conspirators in had fact ever agreed to commit a "robbery" of Mr. Wilson's person or in his presence, or whether, alternatively, they instead had agreed merely to commit a larceny or a theft while he was away.  Consistent with this focused approach to the narrow charge in the Indictment, Mr. Katana's counsel declined to direct his questioning towards addressing the scope of Mr. Katana's knowledge regarding the operations of Mr. Wilson's business or the whereabouts of Ms. O'Brien.  Indeed, because Mr. Katana was not charged with conspiring to rob either Ms. O'Brien or Mr. Wilson's business, such questioning would have distracted the jury from the issues presented in the Indictment.

The eleventh-hour introduction of the government's alternative theory of prosecution—based upon an alleged conspiracy to commit either a "robbery" of Mr. Wilson's business and/or

of Ms. O'Brien—was therefore unfairly prejudicial to Mr. Katana.  Had he known that the government intended to shift its theory of prosecution in that manner, defense counsel may well have taken steps to ask witnesses about the scope of Mr. Katana's knowledge regarding Mr. Wilson's business operations at 6 French Road, or Mr. Katana's knowledge regarding Ms. O'Brien's whereabouts or her residence at that location.  At a minimum, the defense would have attempted to highlight for the jury the utter lack of evidence regarding Mr. Katana's knowledge regarding those matters.  The defense instead focused on defending against the charge set forth in the Indictment, rather than the revamped charges that were advanced by the government at trial. The advancement of those alternative theories of prosecution at trial therefore adversely affected Mr. Katana's substantial rights in connection with this proceeding.  *See Dellosantos*, 649 F.3d at 125-26.

For that additional reason, Mr. Katana's conviction should be vacated, and a judgment of acquittal should enter.  At a minimum, the Court should order a new trial of the case pursuant to Rule 33.

## **<u>CONCLUSION</u>**

For all the foregoing reasons, as well as those articulated during the course of the trial

proceedings in this matter, Defendant Grace Katana requests that this Court enter a judgment of

acquittal on Count One of the Indictment.  In the alternative, for the reasons stated above, this

Court should order a new trial of this matter.

Respectfully submitted,

GRACE KATANA
By his attorney,

*/s/ Daniel J. Cloherty*
Daniel J. Cloherty (BBO #565772)
Todd & Weld LLP
One Federal Street, 27th Floor
Boston, MA 02110
Telephone:  (617) 720-2626
E-mail:  dcloherty@toddweld.com


Dated:  June 21, 2022

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 6, 2022.

*/s/ Daniel J. Cloherty*
Daniel J. Cloherty